

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-25-1994

# USA v. Quintero

Precedential or Non-Precedential:

Docket 93-1377

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"USA v. Quintero" (1994). *1994 Decisions.* Paper 166.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/166

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos.  93-1377; 93-1386; 93-1389
93-1415; 93-1416; 93-1572


UNITED STATES OF AMERICA

v.

MELBA QUINTERO

Appellant in 93-1377.

MARIA RODRIGUEZ

Appellant in 93-1386.

SANTIAGO GONZALEZ

Appellant in 93-1389.

JOSE GONZALEZ-RIVERA
a/k/a "Tosti", Aberto Otero

Jose Gonzalez-Rivera

Appellant in 93-1415.

JOSE CRUZ

Appellant in 93-1416.

JOAQUIN MORGADO

Appellant in 93-1572.


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Criminal Action Nos. 92-00055-01; 02; 05; 08; 10; 12)


Argued: March 24, 1994

Before: HUTCHINSON, ROTH and ROSENN, Circuit Judges

(Opinion Filed  October 25, 1994 )


Michael R. Stiles
United States Attorney
Walter S. Batty, Jr. (Argued)
Assistant United States Attorney
Thomas H. Suddath, Jr. (Argued)
Assistant United States Attorney
Carlos A. Martir, Jr.
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
          Attorneys for Appellee

Mark S. Greenberg, Esquire
Stephen R. LaCheen & Associates
3100 Lewis Tower Building
15th & Locusts Sts.
Philadelphia, PA 19102
          Attorney for Appellant Quintero

Mark D. Mungello, Esquire (Argued)
103 LaCosta Drive
Blackwood, NJ 08012
          Attorney for Appellant Rodriguez

James P. McFadden, (Argued)
Assistant Federal Defender
Elaine DeMasse
Senior Appellate Counsel
Maureen Kearney Rowley
Chief Federal Defender
Defender Association of Philadelphia
Federal Court Division
437 Chestnut Street
Lafayette Building, Suite 800
Philadelphia, PA 19106-2414

          Attorneys for Appellant Gonzalez
Christopher D. Warren, Esquire (Argued)
DeStefano & Warren, P.C.
437 Chestnut Street
Lafayette Building, Suite 1006

Philadelphia, PA 19106
          Attorney for Appellant Gonzales-Rivera

William T. Cannon, Esquire (Argued)
Law Offices of William T. Cannon
12 South 12th Street
2540 PSFS Building
Philadelphia, PA 19107
         Attorney for Appellant Cruz

Lawrence S. Krasner, Esquire
Krasner & Restrepo
924 Cherry Street, 2nd Floor
Philadelphia, PA 19107
         Attorney for Appellant Morgado


OPINION OF THE COURT


ROTH, <u>Circuit Judge</u>:


Defendants Melba Quintero, Jose Gonzalez-Rivera, Maria Rodriguez, Santiago Gonzalez, Joaquin Mordago, and Jose Cruz appeal from judgments entered in the United States District Court for the Eastern District of Pennsylvania after a jury trial in which they were all convicted of conspiracy to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One).  In addition to the conspiracy count, each of the six defendants was convicted of other counts in the twenty-eight count indictment.

The trial lasted twenty days during which the government presented evidence consisting of electronic surveillance, audio recordings, video recordings, documents seized from defendants at the time of their arrest, and testimony

of numerous law enforcement witnesses and of an expert in interpreting drug jargon.  The government also presented the testimony of Cristobal Paz, one of the defendants' co-conspirators, who had pled guilty and who testified as a cooperating witness for the prosecution.

In addition to the conspiracy count, the jury found Gonzalez-Rivera guilty of one count of engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848 (Count Two), two counts of possession with intent to distribute cocaine in violation of 21 § U.S.C. 841(a)(1) (Counts Five and Six), and one count of use of a communication facility to facilitate the conspiracy in violation of 21 U.S.C. § 843(b) (Count Eight).  Rodriguez was convicted of one count of use of a communication facility to facilitate the conspiracy (Count Thirteen).  Gonzalez was convicted of two counts of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts Fourteen and Sixteen) and one count of use of a communication facility to facilitate the conspiracy (Count Twenty-One).  The jury also found that, pursuant to 21 § U.S.C. 853, Gonzalez must forfeit certain property to the United States (Count Twenty-Five).  Quintero was convicted of three counts of use of a communication facility to facilitate the conspiracy (Counts Seventeen, Nineteen, and Twenty), one count of distribution of cocaine (Count Twenty-Two), and one count of possession with intent to distribute cocaine (Count Twenty-Three).  Mordago was convicted

of one count of use of a communication facility to facilitate the conspiracy (Count Eighteen).  Cruz was convicted of one count of possession with intent to distribute cocaine (Count Five).[1]

On appeal, all of the defendants, except Cruz, challenge the district court's refusal to suppress certain telephone surveillance tapes which comprised part of the government's evidence.  Defendants assert that the tapes were not sealed immediately after the final authorization order expired,

---

[1].  As stated, each defendant was convicted on Count One of conspiracy to distribute in excess of five kilograms of cocaine. Based on these convictions, the defendants received the following sentences.  Gonzalez-Rivera was sentenced to life imprisonment on each of Counts One, Two, Five, and Six; 48 months imprisonment on Count Eight to run concurrently with the life terms; and a $250 special assessment.  Rodriguez was sentenced to 144 months imprisonment on Count One; 48 months imprisonment on Count Thirteen to run concurrently with the earlier count; five years supervised release; and a $100 special assessment.  Gonzalez was sentenced to 240 months imprisonment on Counts One, Fourteen, and Sixteen; 48 months imprisonment on Count Twenty-One to run concurrently with the earlier counts; five years supervised release; $21,000 in restitution; $5,000 fine; and a $200 special assessment.  Quintero was sentenced to 235 months imprisonment on Counts One, Twenty-Two, and Twenty-Three; 48 months imprisonment on Counts Seventeen, Nineteen, and Twenty to run concurrently with the earlier counts; five years supervised release; and a $300 special assessment.  According to Quintero's Presentence Report, Quintero was found not guilty on Count Twenty-Eight and discharged as to that forfeiture count.  Our reading of the trial transcript indicates that the jury found that Quintero must forfeit $2,000 resulting from money received as alleged in overt act 36 of Count One, but not guilty as to $3,000 resulting from money received as alleged in overt act 37 of Count One.  Mordago was sentenced to 264 months imprisonment on Count One; 48 months imprisonment on Count Eighteen to run concurrently with the earlier count; five years supervised release; and a $100 special assessment.  Cruz was sentenced to 186 months imprisonment on Counts One and Five to run concurrently; five years supervised release; and a $100 special assessment.

as required by statute, and that the government failed to offer a satisfactory explanation for the delay in sealing. For the reasons which we will more fully develop below, we conclude that certain of the surveillance tapes should have been suppressed. The government concedes that those convictions arising directly from the tapes cannot stand if the tapes are suppressed. We agree and will reverse those convictions. As for the remaining convictions, we will examine them under a harmless error standard to determine whether they must also be reversed.[2]

I.

On February 7, 1992, a grand jury in the Eastern District of Pennsylvania returned a twenty-eight count indictment charging twelve individuals, including the six defendants here,

---

[2]. In addition to the counts affected by the telephone surveillance tapes, and the harmless error analysis we will apply to those counts, defendants also challenge numerous individual aspects of their convictions and sentences. Gonzalez-Rivera asserts that his conviction for conspiracy to distribute cocaine should be dismissed as a lesser included offense and challenges the sufficiency of the evidence to support (1) his conviction of engaging in a CCE and (2) the district court's conclusion that he was involved in the distribution of in excess of 150 kilograms of cocaine. Rodriguez challenges the sufficiency of the evidence to support her conviction of conspiracy to distribute cocaine and the district court's refusal to allow defendant's counsel to cross-examine Quintero. Gonzalez asserts that the district court erred in failing to grant a mistrial sua sponte and to sever his trial from Mordago's trial. Gonzalez also challenges his conviction for conspiracy to distribute cocaine as well as the district court's imposition of restitution and a fine. Cruz challenges the district court's refusal to suppress certain physical evidence obtained during a search of a car driven by the defendant. We have carefully reviewed these grounds for appeal and find them to be without merit.

with a conspiracy to distribute cocaine in the Philadelphia region.  The indictment resulted from an extensive undercover investigation conducted by the Federal Bureau of Investigation ("FBI") and other law enforcement personnel.

After receiving information from a cooperating witness that drug dealers in the Philadelphia area needed vehicles with concealed compartments, the FBI established an undercover operation known as MRK Services, Inc. ("MRK").  MRK rented "load cars"--cars which had secret compartments that could conceal large quantities of drugs or currency.  MRK also leased out mobile cellular telephones.  Hidden video and audio devices had been installed in the MRK offices to record the transactions that took place there.  In addition, monitoring devices had been placed in the load cars to facilitate surveillance.  Two undercover officers, Carlos Tapia ("agent Tapia") and Arsenio Gonzalez ("agent Gonzalez") posed as employees of MRK and in that capacity had dealings with several of the defendants.

As part of the investigation, the government conducted ninety days of electronic surveillance of Paz's cellular telephone, from August 1, 1991, through October 29, 1991.  There were three one-month authorizations and three judicial sealings.  The first authorization expired on August 30, 1991 ("August tapes").  The August tapes were sealed eleven days later, on September 10, 1991, by District Court Judge James J. Giles.  The first extension of the surveillance was authorized for thirty

days and expired on September 29, 1991 ("September tapes"). The September tapes were sealed five days later, on October 5, 1991, by District Court Judge James McGirr Kelly, who was serving as Emergency Judge. The second, and final, extension of the surveillance was authorized for thirty days and expired on October 29, 1991 ("October tapes"). The October tapes were sealed twenty days later, on November 18, 1991, by Judge Giles.

During this period, Paz used his cellular phone to discuss his cocaine business with many of the individuals named in the indictment. At trial, the government offered into evidence sixty tape recordings and four video recordings involving the defendants. A large majority of the taped conversations were of telephone calls on Paz's cellular phone. The remaining calls were recorded as incoming calls to MRK. Each of the defendants, except Cruz, was recorded talking with Paz on a number of occasions. Before turning to the question of whether the government failed to seal the tapes in a manner consistent with the law, an overview of the evidence presented at trial is important to understanding the scope of the enterprise.

In November 1990, an informant serving a term of imprisonment with Cristobal Paz informed the FBI that Paz, who intended to re-enter the drug trade on release from prison, needed a "ghost job" in order to satisfy the terms of his parole. The FBI instructed the informant to give Paz the MRK telephone number. After his release, Paz called MRK and spoke to agent

Tapia about a ghost job. Paz was informed that he could work as a ghost employee with MRK if he agreed to supply MRK with funds up front, which MRK would then use to pay Paz. Paz did not comply with this condition and was not given a ghost job.

On his release from prison, Paz sought to reestablish himself in the Philadelphia area as a major cocaine supplier. He claims to have received large quantities of cocaine from Gonzalez-Rivera in New York and from Oscar Fuentes in Florida. Paz began to sell cocaine to agent Gonzalez. On May 7, 1991, three individuals, working for Paz, delivered one kilogram of cocaine to MRK in exchange for $21,000. After receiving the cocaine, agent Gonzalez called Paz to confirm that it had arrived. Paz testified that this cocaine was supplied by Fuentes and delivered to Philadelphia by Santiago Gonzalez. According to Paz, after he took $1,000 on the deal, he paid Gonzalez the remaining $20,000 for the cocaine. On cross-examination, Paz acknowledged that he had earlier told the FBI that this cocaine was supplied by Gonzalez-Rivera.

Paz testified that, although he was suspicious that agent Gonzalez was working undercover, this first sale helped to convince him that MRK was not an undercover police operation. Three weeks after the first cocaine sale, Paz leased two cellular phones and one digital telephone pager from MRK. One of the telephones was for his own use, while the other was for a

codefendant.  It was Paz's cellular phone that was later wiretapped.

In June 1991, Paz and Jose Rosario travelled to New York to receive a shipment of cocaine from Gonzalez-Rivera.  Paz returned to Philadelphia before receiving the cocaine but testified that Gonzalez-Rivera called to tell him that the cocaine had arrived.  Cruz and Rosario left New York with the cocaine to deliver it to Paz in Philadelphia.  They were stopped by the police for speeding on the New Jersey turnpike.  Because of their suspicious behavior, they were detained and their car was towed to the police barracks.  A police dog reacted positively to the presence of cocaine in the trunk of the car. The New Jersey police obtained a warrant to search a suitcase in the trunk and discovered fifteen kilograms of cocaine in it.

Paz testified that after the seizure of this cocaine Gonzalez-Rivera contacted his boss in the drug network, Guillermo (a/k/a "Memo"), in Medellin, Colombia.  According to Paz, Gonzalez-Rivera received his cocaine from Guillermo and Guillermo worked for Pablo Escobar.

On June 27, 1991, the day after the fifteen kilogram shipment of cocaine was seized, Paz rented a load car from MRK. Agent Gonzalez testified that, when Paz returned the car on July 1, he stated that he had made two trips to New York, carrying forty-six kilograms on each trip and that he had transported a total of 145 kilograms of cocaine while he had the car.  In

addition, Paz said that he had used the car to transport a large amount of cash to Baltimore. After Paz left MRK, the agents inspected the car and found white powder in the hidden compartments. The powder later tested positive for cocaine.

Two days later, on July 3, Paz rented a load car and drove it to New York. When Paz returned the car a little more than a week later, the agents discovered two packages of coffee in the secret compartment. An FBI agent testified that coffee is often used by drug traffickers to mask the smell of drugs from trained drug-sniffing dogs.

On July 15, Paz rented the same load car from MRK. He drove to Gonzalez-Rivera's residence in the Bronx, New York. Paz testified that he met Gonzalez-Rivera to take delivery of twenty-six kilograms of cocaine. New York City detectives set up surveillance at Gonzalez-Rivera's residence and at the residences of co-defendants Diego Jesus Ortega ("Ortega") and Ortega's nephew, Diego Mauricio Lopez-Ortega ("Lopez-Ortega"). Paz met Gonzalez-Rivera in Manhattan and drove to Gonzalez-Rivera's residence in the Bronx. On arriving at his residence, Gonzalez-Rivera removed a gym bag from the car. One hour later, an unidentified individual exited Gonzalez-Rivera's residence with two gym bags and placed them in the car that Paz had rented from MRK. Later that day, Ortega left Gonzalez-Rivera's residence carrying a gym bag which he took to Lopez-Ortega's residence in Queens. Police later obtained permission from Lopez-Ortega to

search his apartment; they found six kilograms of cocaine in a gym bag. Paz testified that the cocaine he received from Gonzalez-Rivera was brought to Philadelphia for distribution. Paz further testified that the cocaine seized from Lopez-Ortega had been rejected by Paz when Gonzalez-Rivera offered it to him. Upon Paz's return of the load car to MRK, agents discovered coffee grounds scattered throughout the secret compartment area.

On September 13, Paz and Santiago Gonzalez met with agent Gonzalez at MRK to sell him one kilogram of cocaine. Agent Gonzalez indicated that he would like to see the cocaine. Santiago Gonzalez told Paz that "it's under your seat" in the car that they had driven to MRK. Paz retrieved the cocaine from the car and was paid $21,000 by agent Gonzalez. Paz took $1,000 to pay for his use of the cellular phone and handed the remaining $20,000 to Santiago Gonzalez. Agent Gonzalez testified that Santiago Gonzalez held onto the money throughout the remainder of the meeting. Paz testified that this kilogram was part of a twenty kilogram delivery that Santiago Gonzalez had brought from Florida.

On October 11, Paz gave five kilograms of cocaine on consignment to agent Gonzalez at MRK ("the October 11 cocaine"). Agent Gonzalez met Paz at a Sunoco gas station near MRK prior to the sale. According to agent Gonzalez, an unidentified female was in the front seat of Paz's car and Santiago Gonzalez was in the back seat. After meeting at the Sunoco Station, Paz and

agent Gonzalez proceeded to MRK in separate cars. Paz entered MRK and delivered the five kilograms of cocaine. After the transaction, agent Gonzalez and Paz walked back outside. Agent Gonzalez noted that the unidentified woman and Santiago Gonzalez had remained in Paz's car. Paz testified that the October 11 cocaine was part of a delivery that Santiago Gonzalez made from Florida.

In a telephone call taped by MRK on October 16, Paz and Santiago Gonzalez asked to be paid for the October 11 cocaine. Agent Tapia testified that the FBI wanted to delay payment because they were planning to arrest Paz in the near future. The FBI arranged a meeting with Paz for the following day. Just moments before Paz was to meet with agent Tapia, the FBI staged a ruse in which the purported pay-off was seized from agent Gonzalez by officers in a marked police car. The seizure was staged so that Paz witnessed the event in an effort to convince him that agent Tapia had planned to make the pay-off.

On October 31, Paz brought three additional kilograms of cocaine to MRK. Agent Gonzalez was instructed by the FBI to accept two of the three kilograms of cocaine from Paz but to refuse the third. Shortly after leaving MRK, Paz was arrested with the remaining kilogram of cocaine in his possession.

Paz testified that he received two and one-half kilograms of this cocaine from Quintero and codefendant Elsa Cruz during a trip to New York and that the remainder was left over

from cocaine supplied to him by Santiago Gonzalez. He said that the cocaine he received from Quintero and Cruz was "wet" and he needed to dry it before selling it to MRK. Paz testified that Mordago helped him by drying the cocaine with acetone and that, during the October 31 transaction, he called Mordago to complain about the quality of the cocaine.

During the week following Paz's arrest, Santiago Gonzalez and agent Tapia talked on the MRK telephone about paying for the October 11 cocaine. On November 8, 1991, Santiago Gonzalez was arrested in the parking lot of a Comfort Inn, where he had arranged to meet agent Tapia to receive the $97,500 which was owed for the October 11 cocaine. Less than an hour later, Mordago was arrested in a room at the Comfort Inn, registered in Santiago Gonzalez's name. On January 16, 1992, agents arrested Gonzalez-Rivera and Rodriguez outside the residence in the Bronx where they lived together. At the time of their arrest, agents seized papers which contained the telephone and beeper numbers for several of the defendants named in the indictment.

II.

The central question in this appeal is whether the district court erred in denying defendants' motions to suppress the wiretaps. The government concedes that the October tapes "were not sealed as soon as administratively practical." In view of this concession, we must decide whether the October tapes should have been suppressed because the government failed to

supply a satisfactory explanation for the sealing delay. On this question, our review is plenary. United States v. Carson, 969 F.2d 1480, 1487 (3d Cir. 1992) ("We exercise plenary review over the legal issues relating to the sealing . . . of the tapes.").

III.

A.

Each of the five defendants, contesting the admission of the wiretap tapes, presented individual briefs to the court. Quintero asserts that all of the tapes must be suppressed. Gonzalez-Rivera and Mordago challenge the August and October tapes, while Rodriguez and Santiago Gonzalez limit their challenge to the October tapes. For the reasons stated below, we conclude that only the October tapes must be suppressed.

In obtaining authorization for tapping into Paz's cellular phone, the government followed the procedures for interception contained in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510 et seq. Defendants do not challenge the initial authorization or the two extensions. The only challenge to the tapes is based on the assertion that the government failed to comply with § 2518(8)(a) which provides, in part, that:

> The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . .

> The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.[3]

(emphasis added).

In United States v. Ojeda Rios, 495 U.S. 257, 260 (1990), the Supreme Court noted that § 2518(8)(a) contains "an explicit exclusionary remedy for noncompliance with the sealing requirement." The Supreme Court determined that, pursuant to § 2518(8)(a), a seal had to be "obtained immediately upon expiration of the underlying surveillance order." Id. at 263 (emphasis added). In the absence of a timely sealing, the Court interpreted the statute to require that the government supply a satisfactory explanation for its failure to comply with the statute. Id. "[T]he 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is

---

[3]. 18 U.S.C. § 2517(3) provides:

> Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

excusable." Id. at 265. The Court held that the explanation offered by the government for the delay must be the explanation relied upon by the government at the suppression hearing and not an excuse presented by the government for the first time on appellate review. Id. at 267.

In Ojeda Rios, a series of court orders authorized electronic surveillance of the defendant in three different locations for three different time periods. The government waited until the end of the entire investigation to seal the tapes. The underlying question was whether the government had been obliged to seal the tapes from each location when that stage of the surveillance had terminated or whether tapings at different locations for different periods of time could be considered to be extensions of the original order. The government asserted that its reason for the delay in sealing the tapes was the prosecutor's misunderstanding of the statutory term "extension." Specifically, the government attorney believed that he was not required to seal any tapes until all the taping had been completed.

The Supreme Court held that the excuse advanced by the government was "objectively reasonable" at the time the government's decision was made, given earlier Second Circuit decisions interpreting the meaning of "extension" and its relationship to the sealing requirement. The Court held that, if the government could show that the prosecutor's misunderstanding

of the law was the excuse given by the government at the suppression hearing, such an "objectively reasonable" understanding of the law would be a "satisfactory explanation" for the government's delay in sealing the tapes. 495 U.S. at 266.

Since Ojeda Rios, we have had two cases which required us to evaluate whether the government's delay in sealing tapes could be excused based on a "satisfactory explanation" provided by the government. See United States v. Vastola, 989 F.2d 1318 (3d Cir. 1993) (Vastola III);[4] United States v. Carson, 969 F.2d 1480 (3d Cir. 1992). In Carson, we held that:

> there are two kinds of justifiable government delays under the statutory scheme. First, there are the relatively short delays necessitated by the process required to comply with the provisions of the Act. . . . Second, there are sometimes longer delays attributable to non-administrative, objectively reasonable causes like understandable mistakes of law and interference from unexpected, extrinsic events beyond the government's control.

969 F.2d at 1488.[5] We also stated in Carson that a "satisfactory explanation is usually based on a mistaken view of the law on

---

[4]. In the present dispute, the government does not rely on a mistaken view of the law to explain why it delayed sealing the tapes. Given that the focus of our decision in Vastola III was on whether the prosecutor's mistaken view of the law was objectively reasonable, we need not discuss that case in detail.

[5]. It is important to emphasize that this first type of delay concerns the short delays related directly to readying the tapes for sealing. In Carson, we noted that "a local United States Attorney can obtain a sealing order simply by presenting the appropriate papers and tapes to the supervising judge. Other

what triggers sealing, but on occasion it can be supplied by an extraneous unforeseen emergent situation."  969 F.2d at 1487 (citing Ojeda Rios, 495 U.S. at 266 and United States v. Massino, 784 F.2d 153, 157 (2d Cir. 1986)).

In Carson, we held that the government offered a satisfactory explanation for the delay in sealing certain tapes based on the prosecutor's mistaken view of the statute's sealing requirements.  969 F.2d at 1493.  However, with regard to a second set of tapes, we rejected the explanation for the delay as unsatisfactory.  The thirty-four day delay in sealing these tapes was caused by the government's sending them from New Jersey to Washington, D.C., to enhance their audibility.  Id. at 1497. Finding that this delay was caused by neither a mistaken view of the statute's requirements nor by an extraneous unforeseen emergent situation, we held that the second set of tapes must be suppressed.

B.

With this background, we now turn to the present dispute.  As a preliminary matter, we address the assertion put forth by Quintero and Gonzalez-Rivera that the August tapes should be suppressed because they were not sealed until the eleventh day after the initial wiretap authorization expired on August 30, 1991.  In Carson, we held that the government's
(..continued)
than gathering the tapes, putting them in boxes and taking the tapes to the supervising judge, the record discloses no other necessary steps to sealing."  969 F.2d at 1489.

obligation to seal tapes under § 2518(8)(a) does not arise until the termination of the final extension of the order. 969 F.2d at 1487 (language in § 2518(8)(a) which states that tapes must be sealed "immediately upon the expiration of the period of the order, or extensions thereof" represents "a Congressional determination that tapes secured under one order need not be sealed while surveillance is being conducted under a related order that may be considered an 'extension.'"). We have determined that a court's authorization to extend a wiretap beyond the initial authorization is generally limited to taps involving the same location, United States v. Vastola, 915 F.2d 865, 874 (3d Cir. 1990) (Vastola II), cert. denied, 498 U.S. 1120 (1991).[6]

The extensions authorized here were clearly a continuation of the initial authorization to tap Paz's cellular phone. None of the defendants have asserted that the first or second extension constituted anything other than a continuation of the initial authorization. Consequently, the August tapes did not have to be sealed until the termination of the entire wiretap operation on October 29, 1991. Given the fact that the August tapes were sealed on September 10, 1991, long before the wiretap terminated on October 29, 1991, the district court properly admitted the August tapes. This same result applies to the

---

[6]. Under the facts of the present case, we now perforce expand that interpretation of "extension" to include taps involving a designated cellular telephone.

September tapes, which were sealed on October 4, 1991, again long before October 29, 1991.  Our focus, therefore, is on the October tapes.

The government concedes that it failed to seal the October tapes immediately:  "Regarding the October tapes, the government concedes that these tapes were not sealed as soon as administratively practical under Carson and Vastola III.  This Court must then determine if the October tapes are nonetheless admissible because the delay was 'objectively reasonable.'"

In order to assess whether the government has supplied a satisfactory explanation for the delay in sealing the October tapes, we are required under Ojeda Rios to examine the reasons supplied by the government to the district court.  In addition, we held in Vastola III that the government "must prove the actual reason for the sealing delay rather than an excuse for some ulterior purpose or administrative bungle." 989 F.2d at 1323. See also Ojeda Rios, 495 U.S. at 267 ("a 'satisfactory explanation' within the meaning of [the statute] cannot merely be a reasonable excuse for the delay; it must also reflect the actual reason for the delay.") (O'Connor, J., concurring, joined by Blackmun, J.).

On the first day of the trial, defendants moved to suppress the tapes based on the government's failure to comply with the statute's sealing requirement.  At the hearing on the motion, FBI agent Michael McGowan, who headed the investigation,

testified that he believed "part of the delay" in sealing was because at the end of the October authorization period both of the Assistant United States Attorneys ("AUSA"s) working on the case "were involved in separate trials." Hearing at 57. When asked on cross-examination what was the other reason for the delay, McGowan testified that "I don't know what the Judge's appointment was when he told the U.S. Attorney to appear. We don't contact the Judge. We go through the U.S. Attorney's office." Id. Later in the hearing, AUSA Carlos Suddath, who was one of the two prosecutors working on the case, asserted that McGowan's testimony supported the contention that the government had provided a satisfactory explanation for the delay. He noted that both he and the other AUSA working on the case, Thomas Martir, were occupied with other trials. Suddath agreed with the district court that his trial was on the same floor as Judge Giles's chambers but explained the delay in sealing by stating that "we also must fit in with the Judge's schedule." Id. at 70.

Because the issue of suppressing the tapes was raised for the first time that day, the district court allowed the prosecution time to file a supplemental brief, opposing the defendants' motion to suppress. The reasons, given by the government in its brief, mirrored those given at the initial hearing on the motion. The government noted that from October 15 to November 15, 1991, AUSA Suddath was on trial before Judge Kelly in a major criminal trial. During the "first two weeks" of

November 1991 AUSA Martir was involved in "substantial pretrial preparation in a complex defense procurement fraud case" which was scheduled to begin on December 3, 1991. The government stated that this involved a substantial amount of time outside the office as Martir interviewed approximately twenty potential witnesses. In addition, Martir was responsible for two sentencing hearings during the first week in November, a detention hearing during the second week in November, and the preparation of the complaints and arrest warrants for Santiago Gonzalez and Mordago. The government also noted that Judge Giles was unavailable between September 30 and November 4, 1991, because he was sitting by designation in the Virgin Islands. Although finding the delay in sealing the October tapes "somewhat more troublesome" than the delays associated with the August and September tapes, the district court held the October tapes admissible. Dist. Ct. Order at 4. After subtracting the four days in which Judge Giles was unavailable, four weekend days, and the Veteran's Day holiday, the district court concluded that the delay in sealing the October tapes amounted to twelve working days.[7] The district court held that "since the delay here falls

---

[7]. In fact, the time period between October 29 and November 18, 1991, included three weekends which, using the district court's methods, would amount to a delay of ten working days. We are aware that we discounted weekend days in Carson in the situation of a taping order expiring on a Wednesday and tapes being sealed the next Monday and of an order expiring on a Thursday and the tapes being sealed the next Wednesday. We held there that the tapes were sealed immediately. 989 F.2d at 1498. However, eliminating the days of one intervening weekend is very different from eliminating the days of multiple intervening weekends. We

within the ambit of the rough rule of thumb suggested in Carson, the tapes are admissible."  Id. at 7.

We interpret the district court's order to hold that the October tapes had been sealed "immediately" under the statute.  Thus, the district court did not address the question of whether there was a satisfactory explanation for the government's delay in sealing the tapes.[8]  However, because the government concedes that the October tapes were not sealed immediately, a conclusion with which we agree, the question now turns to whether the government has offered a satisfactory excuse.  Because this is a question of law subject to plenary review, and the record before us is complete, we are in a position to decide it.

C.

The primary reason offered by the government for the delay in sealing the October tapes is the workload of the AUSAs responsible for prosecuting the case.  In support of its assertion that a prosector's workload can serve as a satisfactory

(..continued)
do not address here the propriety of subtracting the days of multiple intervening weekends in determining the length of the delay.

[8]. In making its finding, the district court did hold that it was permissible to include the days Judge Giles was unavailable. The district court made no substantive findings, however, with regard to the work schedules of the two AUSAs prosecuting the case.  The court made passing reference to the fact that the October tapes were sealed "the first working day after AUSA Suddath completed a month-long trial."  Dist. Ct. Order at 4.  No mention was made of AUSA Martir.

excuse, the government points to language in Carson, 969 F.2d at 1498, and decisions from several other courts of appeal. See United States v. Pedroni, 958 F.2d 262 (9th Cir. 1992) (fourteen day delay permitted); United States v. Rodriguez, 786 F.2d 472 (2d Cir. 1986) (same); United States v. Scafidi, 564 F.2d 633 (2d Cir. 1977) (7 day delay permitted), cert. denied, 436 U.S. 903 (1978).[9]

A review of these cases reveals that there are substantial differences between them and the present dispute. Moreover, the only language we find in Carson which suggests support for the proposition asserted by the government that "[t]his Court . . . has recognized that personnel shortages, including the trial schedule and work responsibilities of a prosecutor, may be a 'satisfactory explanation'" is the statement:

> We recognize that there may be limited special circumstances apart from the administrative practicalities of obtaining a sealing order that would justify some delay.

---

[9]. The government's brief also directs us to our opinion in Vastola III, 989 F.2d at 1327-28 n.1 (view of Nygaard, J.) in support of the government's assertion that "personnel shortages, including the trial schedule and work responsibilities of a prosecutor, may be a 'satisfactory explanation' for a sealing delay." The dispute in Vastola III involved the question, inter alia, of whether the government's mistaken view of the law was an objectively reasonable one at the time. The dispute did not involve a question of whether administrative difficulties or attorney caseload might be a satisfactory explanation for a delay in sealing tapes. We regard the language in footnote 1 concerning an attorney's caseload as dictum, given that such language was not relevant to our decision in Vastola III.

969 F.2d at 1498.  However, in Carson we then went on to discuss United States v. Massino and the adequacy of an excuse if the need for it was brought about by "unusual and unforeseeable" circumstances -- not by normal, albeit heavy, work schedules.

In Massino, the defendants moved to suppress surveillance tapes which the government sealed after a delay of fifteen days.  The government claimed that the delay was caused by the need to divert resources for "an immediate, sensitive and comprehensive investigation into a 'leak' of information" concerning the electronic surveillance of the defendants.  784 F.2d at 154 n.2.  The government, fearful that the leak would jeopardize its ongoing investigation and expose confidential informants to danger, devoted all its resources to finding the leak.

While the court of appeals in Massino expressed concern about the length of delay, it ultimately held that the tapes should not be suppressed.  Id. at 158.  The court based its decision, in part, on the "lack of foreseeability that a large investigation would be needed" and that the leak represented an "urgent matter."  Id.  Massino then does represent a "limited special circumstance" in which a delay attributable to events unrelated to the sealing of the tapes is found to be a satisfactory explanation.

In Carson, we noted that "on occasion [a satisfactory explanation] can be supplied by an extraneous unforeseen emergent

situation." 969 F.2d at 1487 (citing Massino, 784 F.2d at 157). However, we held that the facts presented in Carson did not constitute a satisfactory explanation. The need to enhance the audibility of the tapes was "readily foreseeable and could just as readily become routine." 969 F.2d at 1498. We distinguished Massino, where there was "an unexpected, urgent need for investigation of a damaging leak. Such a situation is unusual and unforeseeable." Id.

We find the excuse offered by the government in the present case closer to the excuse in Carson than to that in Massino. AUSA Suddath's trial was foreseeable. In fact, he had been working on the same trial for two weeks prior to the termination of the surveillance operation. Similarly, there was nothing in AUSA Martir's caseload that was unusual. The government asserts that Martir's caseload increased unexpectedly when Santiago Gonzalez and Mordago were arrested on November 8, 1991. This increase is more consistent with the expected flow of cases into the United States Attorney's office than it is with the type of emergency described in Massino. In addition, the government acknowledged during oral argument that it could have assigned any one of the many AUSAs in the Eastern District to process the sealing of the tapes before Judge Giles. The government also conceded that the sealing was a "relatively simple procedure under the facts here." In response to a

question concerning the mechanics of a sealing, the government responded:

> They are very limited, your Honor. My estimate to the court is that in terms of the total time for example for that to be accomplished in front of the district court judge, we're not talking about more than fifteen minutes. It is simply a matter of our assembling the tapes, putting them into boxes, taking them over to the courthouse, presenting them to the judge with a sealing order. The tapes are physically sealed in front of the judge. He initials the corners of the parcel, the box in which they are sealed to make sure that it can't be opened without its being noticed. We then take them down to the clerk's office where they are given to a designated clerk and I believe kept in the district court clerk's safe.

The other cases cited by the government in support of its position are also distinguishable. The government cites Rodriguez for the proposition that a fourteen day delay was permitted when the supervising attorney was preoccupied with another trial. A closer reading of Rodriguez reveals that this excuse was but one of many factors relied upon by the court in vacating the district court's suppression order. The court of appeals credited the government's explanation that the "bulk of the delay was caused in part" by the prosecutor's mistaken belief that a comprehensive report had to be filed at the time the tapes were sealed. 786 F.2d at 478. While the prosecutor's workload in Rodriguez was a factor in finding time to prepare the report she mistakenly believed was needed, the primary rationale for the

delay was the belief that a comprehensive report was needed in the first place, an excuse which the government does not claim is applicable here.

The government cites <u>Scafidi</u> for the proposition that a seven day delay was permissible when the prosecutor was preoccupied with an upcoming trial. While this was the only reason provided for the delay, the court held that the government "presented a satisfactory explanation for this <u>short delay</u>." <u>Scafidi</u>, 564 F.2d at 641 (emphasis added). As we noted in <u>Carson</u>: "The length of a sealing delay is a relevant factor in considering whether an explanation is satisfactory," 969 F.2d at 1498 (citing <u>United States v. McGrath</u>, 622 F.2d 36, 42 (2d Cir. 1980)). We are not faced with a seven day delay in the present case. We do not, therefore, need to determine if such a delay would be acceptable in this circuit.

Perhaps the closest case to the present is <u>Pedroni</u>, in which the government offered two reasons for the fourteen day delay in sealing the tapes: the heavy workload of the FBI agent responsible for preparing the tapes for sealing and the unavailability of the judge. Notwithstanding the fact that the reasons provided by the government in <u>Pedroni</u> are comparable to the explanations here, our decision in <u>Carson</u> steers us away from delays caused by a prosecutor's ordinary responsibilities, despite how onerous those ordinary responsibilities may be. To

the extent that Pedroni supports the government's position, we decline to follow it.

In summary, we conclude that a prosecutor's routine duties, hectic as that routine may be, are not a satisfactory explanation for failing to comply with the immediacy requirement of § 2518(8)(a). Were we to agree with the government, we would be rendering extraordinary that which is ordinary. We decline to do so.

D.

The second rationale offered by the government is that Judge Giles's unavailability should be considered a satisfactory explanation for a part of the delay. The courts of appeal which have considered the question of whether a judge's absence can serve as a satisfactory excuse have reached opposite conclusions. Compare United States v. Pedroni, 958 F.2d 262, 266 (9th Cir. 1992) ("unavailability of the issuing or supervising judge may constitute a satisfactory explanation for a sealing delay"); with United States v. Rodriguez, 786 F.2d 472, 476 (2d Cir. 1986) (government's reliance on the absence of issuing judge to explain part of the delay is unacceptable given prior Second Circuit decisions which made clear that other judges could properly seal tapes). In reaching its decision in Pedroni, the Ninth Circuit expressly relied upon prior Second Circuit decisions which held that a judge's unavailability could serve as a satisfactory explanation for a delay in sealing. See United States v. Fury,

554 F.2d 522, 533 (2d Cir. 1977) (six day delay reasonably explained by unavailability of issuing judge who was on vacation), cert. denied, 436 U.S. 931 (1978); United States v. Poeta, 455 F.2d 117, 122 (2d Cir.) (thirteen day delay approved where agents assumed issuing judge must seal tapes), cert. denied, 406 U.S. 948 (1972).  However, subsequent to Fury and Poeta, the Second Circuit noted in United States v. Vazquez, 605 F.2d 1269, 1280 n.25 (2d Cir.), cert. denied, 444 U.S. 981 (1979), that "tapes sealed by a judge other than the 'issuing judge,' because of the absence or unavailability of the latter, are considered properly sealed."  This language in Vazquez was the express basis for the Second Circuit's later decision in Rodriguez that it would no longer consider a judge's unavailability as a satisfactory excuse for a sealing delay.

Judge Giles, who had approved the initial authorization and both extensions to conduct electronic surveillance of Paz's cellular phone, was unavailable before November 4, 1991, because he was sitting in the Virgin Islands.  We find, however, that the fourteen day delay after Judge Giles's return is excessive under the standards of Ojeda Rios.  For this reason, we do not need to, and we will not, decide whether the absence of the supervising judge, in and of itself, is sufficient excuse for any delay in sealing.  Nevertheless, we do note in this regard, that any judge in the district can order the tapes sealed, as did Judge Kelly on October 10, 1991.

E.

The final argument for admissibility of the tapes arises from the fact that the FBI exercised elaborate and painstaking procedures to insure their integrity. As the district court found, the tapes remained "sealed (although not officially under judicial holograph), locked away in secure evidence storage, unbudged and untouched" prior to the judicial sealing and the "actual integrity of the tapes has not been challenged." Dist. Ct. Order at 6. But as the Supreme Court held in Ojeda Rios, "[t]o hold that proof of nontampering is a substitute for a satisfactory explanation is foreclosed by the plain words of the sealing provision." 495 U.S. at 264-65. Because we find that the government has failed to offer a satisfactory explanation for the delay in sealing the October tapes, § 2518(8)(a)'s "explicit exclusionary remedy" must be employed. Id. at 260.

IV.

Given our decision that the October tapes should have been suppressed, we now turn to the question of whether the admission of the October wiretap evidence was harmless error. At oral argument, we invited the parties to submit briefs addressing the issue of harmless error. We have carefully reviewed these submissions.

As a preliminary matter, the convictions for use of a communication facility, which are based on communications

intercepted and recorded on the October tapes, will be reversed. Quintero was convicted of three such counts: Count Seventeen, based on an October 11, 1991, telephone call; Count Nineteen, based on an October 23, 1991, telephone call; and Count Twenty, based on an October 26, 1991, telephone call. Santiago Gonzalez was convicted on Count Twenty-One, based on an October 28, 1991, telephone call. Mordago was convicted on Count Eighteen, based on an October 12, 1991, telephone call. Without the October tapes, the government concedes that there is no evidence to sustain the defendants' convictions on these counts.[10]

We now turn to those convictions which require a more extensive review of whether the admission of the October tapes constituted harmless error. In making this assessment, we first must determine whether the error alleged is constitutional or nonconstitutional. See United States v. Grayson, 795 F.2d 278, 290 (3d Cir. 1986) (finding that challenged jury instruction did not affect any possible constitutional right, court applied

---

[10]. In its supplemental brief the government states that Maria Rodriguez's conviction on the telephone count should be reversed if the October tapes are suppressed. Rodriguez was indicted on two counts of use of a telephone to facilitate the conspiracy in Count One. Count Thirteen was based on a telephone call on September 5, 1991, and Count Fifteen was based on a telephone call on October 10, 1991. At trial, Rodriguez was convicted on Count Thirteen, but acquitted on Count Fifteen. This result is confirmed in both the docket sheet and sentencing report signed by the district court. Given the fact that Rodriguez was not convicted on the telephone related count based on her October 10, 1991, conversation with Paz, there is no need to reverse. Her convictions will be discussed infra.

"highly probable" standard of appellate review to assess the question of harmless error), cert. denied, 481 U.S. 1018 (1987).

We find that the dispute here involves a claim of nonconstitutional error in that it is based solely on a violation of § 2518(8)(a). Therefore, in deciding whether the admission of the October tapes constituted harmless error, we must evaluate whether it is "highly probable that the evidence did not contribute to the jury's judgment of conviction." Government of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976). "'High probability' requires that the court have a 'sure conviction that the error did not prejudice the defendant,' but need not disprove every 'reasonable possibility' of prejudice." Grayson, 795 F.2d at 290 (quoting United States v. Jannotti, 729 F.2d 213, 219–220 n.2 (3d Cir.) cert. denied 469 U.S. 880 (1984)). We will review each defendant's convictions applying this standard.

## A. Jose Gonzalez-Rivera

The jury found Jose Gonzalez-Rivera guilty of one count of conspiracy to distribute in excess of five kilograms of cocaine (Count One), one count of engaging in a CCE (Count Two), two counts of possession with intent to distribute cocaine (Counts Five and Six), and one count of use of a communication facility to facilitate the conspiracy in Count One (Count Eight). None of Gonzalez-Rivera's convictions were based directly on conversations recorded on the October tapes.

Gonzalez-Rivera's conviction on the telephone count (Count Eight) was based on a conversation between Paz and Gonzalez-Rivera on August 9, 1991. We have held that the August tapes were admissible. Admission of the October tapes was clearly harmless as to the conviction on this count.

The evidence on the remaining counts against Gonzalez-Rivera was substantial. Count Five was based on the fifteen kilograms of cocaine seized by the New Jersey police when Cruz and Rosario were stopped on the New Jersey Turnpike on June 26, 1991. Paz testified that he and Rosario had travelled to New York in late June 1991 in order to receive this cocaine from Gonzalez-Rivera. Paz testified that, although he returned to Philadelphia before the cocaine had been delivered, Gonzalez-Rivera called him to report that it had arrived.

Count Six was based on the seizure of six kilograms of cocaine from the residence of Lopez-Ortega on July 15, 1991. Regarding this cocaine, Paz testified that he had travelled to New York in a load car rented from MRK in order to pick up a large quality of cocaine from Gonzalez-Rivera. Paz further testified that he accepted twenty kilograms of cocaine from Gonzalez-Rivera but that he did not like the quality of the remaining six kilograms, nor would they fit into the concealed compartment of his car. According to Paz, Gonzalez-Rivera called Ortega and asked that he remove the remaining six kilograms of cocaine from Gonzalez-Rivera's residence because Gonzalez-Rivera

was concerned that law enforcement officials were conducting surveillance of him and Paz. Surveillance did in fact establish that Ortega then transported a gym bag from Gonzalez-Rivera's residence in the Bronx to Lopez-Ortega's residence in Queens, New York. A gym bag containing six kilograms of cocaine was seized from Lopez-Ortega's residence that evening. Because of the strong evidence in support of Counts Five and Six, we find that the introduction of the October tapes was clearly harmless as to Gonzalez-Rivera's convictions on these counts.

Gonzalez-Rivera asserts, however, that the admission of the October tapes constituted prejudicial error in regard to the conspiracy and CCE convictions (Counts One and Two) because two telephone conversations, recorded in October, were used to establish his connection to Guillermo (a/k/a Memo), a drug supplier in Medellin, Colombia. Gonzalez-Rivera asserts that these conversations supported the government's contention that he was a "leader of a Medellin cocaine cartel 'cell' in New York City" as alleged in Count One.

Gonzalez-Rivera was not recorded on either of these October tapes. Both of these calls involved Paz and Rodriguez and took place on October 11, 1991. During the first conversation, Rodriguez relayed a message from Gonzalez-Rivera to Paz for Paz to call Guillermo in Medellin, Colombia, regarding a $6,000 payment that Guillermo was demanding. Rodriguez supplied Paz with Guillermo's phone number in Medellin. Immediately after

his conversation with Rodriguez, Paz attempted to call Guillermo. When Paz supplied Guillermo's number to the operator, the operator told Paz that the call could not be billed to Paz's cellular telephone. At this point, the call was interrupted on "call waiting" by Rodriguez. During this second conversation, Rodriguez informed Paz that Gonzalez-Rivera wanted Paz to call him immediately instead of talking to Guillermo. Paz's trial testimony confirmed the content of these conversations.

Gonzalez-Rivera's defense depended in part on his own testimony that he was not a member of the Medellin cartel. On direct examination, Gonzalez-Rivera testified that Memo was a loan shark in New York from whom Gonzalez-Rivera had borrowed $6,000.[11] In an effort to impeach Gonzalez-Rivera's testimony

---

11. Gonzalez-Rivera testified on direct examination as follows:

> Q: There was great deal of testimony about a guy named Memo, do you remember that?
>
> A: Yes, I remember the man.
>
> Q: Tell the jury who Memo is?
>
> A: Memo is a big shot in New York that lent me money. He lent me six thousand dollars.
>
> Q: Is Memo a loan shark?
>
> A: Yes.
>
> Q: Now, when did you talk to Memo about getting six thousand dollars?
>
> A: After Mr. Paz, he owed me the money.
>
> Q: After Mr. Paz promised you the six thousand dollars?

concerning Memo, the government on cross-examination questioned Gonzalez-Rivera with regard to the two telephone conversations.[12] (..continued)

　　　　A: Yes.

Trial Transcript ("TT") at 51 (Sept. 16, 1992).

[12]. The government cross-examined Gonzalez-Rivera as follows:

　　　　Q: And Memo is this loan shark who lives in the Bronx?

　　　　A: Yes.

　　　　Q: You have been feeding Paz's ego by saying that he lives in Colombia?

　　　　A: No.

　　　　Q: You never said that?

　　　　A: No.

　　　　Q: You never told Maria Rodriguez to tell Paz to call Memo in Colombia?

　　　　A: Yeah, I told Maria. I told Maria, but I gave a fax number. He never went through with it because he never talked to me, Memo.

　　　　Q: You heard the phone call where he tried to call Colombia?

　　　　A: Yeah. You hear, he never talked to Memo.

　　　　Q: Did you hear the operator say that the billing was denied?

　　　　A: Yes.

　　　　Q: So he could not charge the call?

　　　　A: Yes, but he never got through with it. I know that that's not a telephone number for Memo.

In addition, the government made reference to the conversations during its closing argument as evidence of Gonzalez-Rivera's connection to Medellin.

Gonzalez-Rivera asserts prejudice in that the telephone conversations provided confirmation of Paz's testimony on direct examination that Gonzalez-Rivera received large quantities of cocaine from suppliers in Medellin. He contends that the combined effect of the use of these recordings constituted prejudicial error leading to his conviction on the conspiracy and CCE counts.

In conducting the harmless error analysis, we must keep in mind that the government produced admissible testimony by Paz, a participant in the calls, about the calls. However, would the jury have credited Paz's uncorroborated version of the calls without any other support? We must consider whether the jury's exposure to the content of the calls induced the jurors to give undue credit to Paz's testimony, rather than to Gonzalez-Rivera's.

(..continued)

> Q: Why would you give a telephone number of a loan shark that you met in the Bronx? Why did you give a number to Medellin in Colombia to Paz?
>
> A: That's what they wanted to hear, Paz.
>
> Q: This was part of you feeding his ego?
>
> A: Yes.

TT at 114-15 (Sept. 16, 1992).

There is precedent, however, to support the admission of the content of the tapes for impeachment purposes even if the tapes were inadmissible on the merits of the government's case. In view of Gonzalez-Rivera's testimony on direct examination about his relationship with Memo, the tapes of the calls could have been used to attack Gonzalez-Rivera's credibility. Even though the two conversations should not have been admitted during the government's case-in-chief, unlawfully obtained evidence may be used to impeach the direct testimony a defendant gives at trial. See Walder v. United States, 347 U.S. 62, 65 (1954). In Walder, the Supreme Court held that it was permissible for the government to use testimony regarding drugs obtained in an illegal search to impeach the testimony of the defendant that he had never possessed any narcotics.

On direct examination here, Gonzalez-Rivera testified that Memo was a loan shark in New York to whom Gonzalez-Rivera owed $6,000. As a result, the issue of Gonzalez-Rivera's relationship to Memo was clearly brought into question by Gonzalez-Rivera's direct testimony. Once he put his relationship to Memo in issue by offering the loan shark explanation, the government was entitled to rebut this explanation by showing that Gonzalez-Rivera's testimony was untrue. Although the content of these two tapes was admissible only to impeach Gonzalez-Rivera's testimony about Memo, and not admissible as direct evidence of Gonzalez-Rivera's involvement with Memo, it was precisely this

aspect of the testimony that Gonzalez-Rivera complains of, i.e., that the jury believed Paz, rather than Gonzalez-Rivera, on the question of Gonzalez's relationship with Memo and the Medellin cartel. Because this element of the evidence, the impeachment factor, was permissible under the circumstances, we find the spill over into the merits of the government's case to be harmless.[13]

Moreover, our review of the record indicates that the other evidence, tying Gonzalez-Rivera to the Medellin cartel, was

_____

[13]. The use of the October calls to impeach Gonzalez-Rivera is further supported by his testimony during the initial phase of the government's cross-examination. See United States v. Havens, 446 U.S. 620 (1980). On cross-examination, Gonzalez-Rivera testified that many of his telephone conversations with Paz recorded by the government during August and September 1991 concerned $6,000 that Paz owed him from an earlier debt, money which Gonzalez-Rivera testified he planned to use to pay off Memo. In Havens, the Supreme Court considered whether "evidence suppressed as the fruit of an unlawful search and seizure may nevertheless be used to impeach a defendant's false trial testimony, given in response to proper cross-examination, where the evidence does not squarely contradict the defendant's testimony on direct examination." 446 U.S. at 621. While Walder is more on point to the present case because Gonzalez-Rivera did testify as to Memo's identity on direct examination, Havens is also instructive. The Supreme Court held that "a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt." Id. at 627-28. Not only could the government use the fact of the two calls to impeach the defendant's direct testimony that Memo was a loan shark in New York, such evidence could have been used to impeach the defendant's credibility based on his testimony during cross-examination.

substantial.  Paz testified that Gonzalez-Rivera served as one of his major cocaine suppliers.  In describing his trip to Gonzalez-Rivera's residence in April, 1991, to pick up fifteen kilograms of cocaine from Gonzalez-Rivera and Cruz, Paz testified that Gonzalez-Rivera received his cocaine from Medellin.

Q: Now, you've testified that with respect to
Jose Gonzalez-Rivera, that the cocaine that
he received came from Medellin, Colombia?

A: Yes, sir.

Q: How did you know that?

A: Because the telephone calls that he was
making to Colombia, he made a lot of calls in
front of me.

Q: And what were those calls?  What was discussed
during those calls that you were present during that
period?

A: Well, when we lost 15 kilos on the turnpike, that
was one of the things that he had to call down there,
to Medellin to talk to his bosses about, and the other
one was some money -- they stole some merchandise from
me in Philadelphia.

Q: When you refer to merchandise, what are
you referring to?

A: Cocaine.

Q: Now, did you know the names of the
individuals that Jose Gonzalez would speak to
in Colombia?

A: Yes. Guillermo.

Q: Did you ever get to know an individual by
the name of Memo?

A: No, I didn't meet him.  I did not speak to
him, but Jose did speak to me about him.

Q: Who was Memo to Jose Gonzalez-Rivera?

A: His boss.

Q: His boss for what?

A: For cocaine.

. . .

Q: So Guillermo and Memo are one in [sic] the same?

A: Yes, sir.

TT at 27-29 (Sept. 2, 1992; Afternoon Session).

The government presented other evidence of Gonzalez-Rivera's connection to Memo:  During a conversation recorded on August 1, 1991, Paz and Gonzalez-Rivera discussed Cruz's arrest and the seizure of the fifteen kilograms of cocaine; Paz testified that they discussed the need to send Cruz's arrest papers to Memo in Medellin, in an effort to justify the loss of the fifteen kilograms; during a conversation recorded on August 17, 1991, Paz and Gonzalez-Rivera discussed a cocaine transaction; when Paz informed Gonzalez-Rivera that he could get a very high price for cocaine, Gonzalez-Rivera responded that he was "gonna call that man down south"; Paz testified that he understood the defendant to be referring to Memo in Medellin.[14] Paz testified that he understood these references to be to Memo.

---

[14].  This was one of several instances in which Gonzalez-Rivera makes reference to a "man down south" in connection with a payment or debt for cocaine or in connection with a drug transaction.

In another telephone conversation, recorded on September 21, 1991, Gonzalez-Rivera told Paz that Gonzalez-Rivera had given up a piece of property in Colombia as security for a debt of $34,000 that Paz owed to Gonzalez-Rivera and that Gonzalez-Rivera in turn owed to "that man." Paz testified that Gonzalez-Rivera owned a condominium and large farm in Medellin.

In total, Paz testified in regard to fifteen telephone conversations, between himself and Gonzalez-Rivera, which were recorded by the government wiretap between August 1 and October 29, 1991. Thirteen of these recordings were properly admitted. The jury had the opportunity to listen to each of these conversations and at the same time to review a transcript of them. Paz pointed out specific portions of each telephone call in which he and Gonzalez-Rivera discussed their drug business.

The government also presented the testimony of FBI agent Harold Clouse as an expert witness in the field of drug jargon analysis. Clouse reviewed the entire set of tape recordings and testified as to eight telephone conversations between Paz and Gonzalez-Rivera. Of these eight calls, only one was recorded during October. The other seven were properly admitted.

Clouse testified that a majority of these calls were drug related. For instance, he testified that a telephone conversation between Paz and Gonzalez-Rivera, recorded on August 14, was a drug related call in which Gonzalez-Rivera quoted Paz a

price for a kilogram of cocaine and they discuss how much Paz could charge his buyers for it.  Clouse testified that there were other references in this conversation to cocaine which Gonzalez-Rivera planned to supply to Paz.  In addition, Clouse testified that three days later, on August 17, Paz and Gonzalez-Rivera engaged in a drug related conversation in which they discussed the price of a kilogram of cocaine.  In connection with this telephone call, Paz described how the cocaine he received from Gonzalez-Rivera was supplied to Gonzalez-Rivera:  A call would be made to an individual in Colombia, that person would call New York to authorize delivery of cocaine, and the cocaine would be delivered the next day.  Asked how he knew about this arrangement, Paz responded that Gonzalez-Rivera had explained it to him.  Paz testified that, after these arrangements were made, he would pick up his cocaine at Gonzalez-Rivera's residence in the Bronx.

In addition, FBI agent McGowan testified that at the time of Gonzalez-Rivera's arrest, Gonzalez-Rivera had Memo's telephone number handwritten on several pieces of paper in his wallet.  This number corresponded to a telephone number that, at the time of Paz's arrest, Paz had in his address book under the name of Guillermo.

Despite this evidence, Gonzalez-Rivera asserts that the admission of the two October calls constituted prejudicial error. It is true that the government made reference to the two October

calls during its closing argument as evidence of Gonzalez–Rivera's connection to Medellin.  We find, however, that the references to these two phone conversations were merely cumulative of other substantial evidence connecting Gonzalez–Rivera to this conspiracy.

We conclude that, in light of all this evidence, Gonzalez–Rivera was not prejudiced by the erroneous admission of the October tapes.  For that reason, their admission was harmless as to his conviction on Counts One and Two.  See United States v. Jannotti, 729 F.2d at 219–20 (to find error harmless, we must have a sure conviction that the error did not prejudice the defendant; yet we need not disprove every possibility of prejudice).  We will uphold Gonzalez–Rivera's convictions on all of the counts for which he was convicted.

## B. Maria Rodriguez

Maria Rodriguez was convicted of one count of conspiracy to distribute in excess of five kilograms of cocaine (Count One) and one count of use of a communication facility to facilitate the conspiracy in Count One (Count Thirteen).  The conviction on Count Thirteen was based on a September 5, 1991, phone call.  Since we have held that the September tapes were admissible, the admission of the October tapes was clearly harmless error as to Count Thirteen.

Turning to the conspiracy conviction, Rodriguez in her supplemental brief adopted the arguments advanced by Gonzalez–

Rivera as to the prejudicial effect of the admission of the October tapes. The government asserts that the admission of the October tapes constituted harmless error based on the substantial evidence, excluding the October calls, against Rodriguez.

The government's evidence against Rodriguez consisted of testimony by Paz and FBI agent Clouse about items seized from the defendant at the time of her arrest[15] and about five telephone conversations between the defendant and Paz. Two of the five conversations were recorded in September 1991, with the remaining three recorded in October 1991. Paz testified as to all five calls and his participation in them. Clouse testified as to four of the five calls, identifying each as drug related.

The first of these calls was made on September 5. In it, Paz and Rodriguez discussed Paz's request for five kilograms of cocaine in exchange for $100,000 and of an additional five kilograms of cocaine on consignment. Rodriguez asked Paz, "[F]or how many are you striking for?" Paz responded, "Okay, tell him that we can get five for cash and five on credit for me." Paz testified that he had made this telephone call to Rodriguez at home because he believed Gonzalez-Rivera's telephone at work was being tapped. He further testified that Rodriguez was acting as

_____

[15]. These items included a receipt for a $25 money order for Jose Cruz; the work and beeper numbers for Gonzalez-Rivera; the home, beeper, and cellular telephone numbers for Paz; and the home phone numbers of Ortega and another codefendant.

a messenger for Gonzalez-Rivera.  Clouse confirmed that this call was drug related.

During the September 6 call, Paz informed Rodriguez that $15,000 from another drug deal had been stolen from him the night before at Rodriguez's cousin's house in New York.  During this conversation, Rodriguez told Paz that she thought he had lost "material" or "sugar for coffee."  Clouse testified that Rodriguez's use of the word "material" was a code word for cocaine and that this was a drug related call.

Two of the October calls took place on October 11, 1991.  The third October call took place on October 17, 1991.  During it, Rodriguez urged Paz to call Gonzalez-Rivera.  Rodriguez expressed concern that Paz and Gonzalez-Rivera were not talking to each other, at which point Paz responded that he needed work to pay his debts.  Clouse identified this as a drug related call in which Paz told Rodriguez that he needed cocaine to sell.  Paz's testimony confirmed Clouse's interpretation.

In adopting the prejudicial error argument advanced by Gonzalez-Rivera, Rodriguez is essentially asserting that the October calls had the effect of tying her to the conspiracy.  However, we agree with the government that Rodriguez's September 5, 1991, conversation established her active role in the conspiracy.  In conducting a harmless error analysis, we need not disprove every reasonable possibility of prejudice to the defendant.  Rather, we shall affirm in those cases in which we

have a sure conviction that the error did not prejudice the defendant.  See Jannotti, 729 F.2d at 219-20.  In this instance, we conclude that the evidence of the September 5, 1991, call and the testimony concerning its substance is sufficient to affirm Rodriguez's conviction.

### C. Santiago Gonzalez

Santiago Gonzalez was convicted of one telephone count which was based on the tape of an improperly admitted October phone call (Count Twenty-One).  The government concedes that his conviction on this count must be reversed and we will do so.  Gonzalez's remaining convictions include conspiracy to distribute in excess of five kilograms of cocaine (Count One) and two counts of distribution of cocaine (Counts Fourteen and Sixteen).

Gonzalez's argument concerning the prejudicial impact of the October tapes is, in our view, intertwined with his other arguments on appeal.  Consequently, we will consider all of his contentions together.  He advances three major challenges to his convictions.

First, Gonzalez contends that the district court committed plain error when it failed, sua sponte, to sever his trial from Joaquin Mordago's once it became clear that "Mordago's antagonistic defense prevented [Gonzalez] from receiving a fair trial."  Gonzalez contends that Mordago's "authorized informant" defense was antagonistic to his own defense, thereby presenting the jury with no option but to convict at least one of them.

Gonzalez claims that once Mordago's defense unfolded at trial, the district court was required to grant a mistrial and severance.

Second, Gonzalez asserts that his conspiracy conviction should be vacated because there was a variance between the single conspiracy charged in the indictment and the evidence presented, which demonstrated multiple conspiracies. Gonzalez contends that the prejudice resulting from the purported variance was the impact it had on the district court's decision to try all of the defendants together rather than sever Gonzalez's trial from his co-defendants' or later from Mordago's.

Third, Gonzalez contends that the admission of the October tapes was not harmless error because it supplied the only evidence to support the government's contention that Gonzalez was part of the single conspiracy alleged in Count One. As a result, the admission of the October tapes compounded the purported error of the variance between the single conspiracy charged in Count One and the multiple conspiracies which Gonzalez claims were described at trial. While Gonzalez did not expressly set out the prejudicial impact flowing from the admission of the October tapes, it is clear from his assertion relating to the "variance" challenge that he contends that it was only through the October tapes that the government established that Gonzalez was aware that Paz had other sources of supply. In sum, Gonzalez asserts that these three errors, individually and cumulatively,

prejudiced his right to a trial separate from co-defendant Mordago, given the claim that Mordago presented a mutually antagonistic defense.  Because we find that Gonzalez was not prejudiced in this manner, we hold that his convictions must be upheld.

### i. Gonzalez's Claim of Variance

A defendant alleging a variance between a single conspiracy charged in an indictment and the proof presented at trial must demonstrate, first, that there was such a variance and, second, that the variance prejudiced one of his substantial rights.  United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989) (citing United States v. Schurr, 755 F.2d 549, 553 (3d Cir. 1985)).  However, even if we were to find that Gonzalez has demonstrated that a variance existed here, we are not convinced that he was prejudiced.

First of all, in the matter of the variance, a single drug conspiracy may involve numerous suppliers and distributors operating under the aegis of a common core group.  United States v. Theodoropoulos, 866 F.2d 587 (3d Cir. 1989).  To establish a single conspiracy, the prosecutor need not prove that each defendant knew all the details, goals or other participants.  See United States v. Padilla, 982 F.2d 110 (3d Cir. 1992).  The prosecution must, however, demonstrate that a defendant, charging variance, knew that he was part of a larger drug operation.  Id. at 114; Theodoropoulos, 866 F.2d at 594.  Gonzalez argues that

the only way by which the government showed he was aware of the larger operation was through two of the October telephone calls. However, our review of the record does not support this allegation. There was also separate testimony by Paz concerning his discussions with Gonzalez about cocaine in New York which needed to be treated in order to dry it. Because there was evidence through Paz's testimony, which demonstrated that Gonzalez was aware of the larger operation, the jury's finding of a single conspiracy is supported even without the October tapes. Moreover, pursuant to Kelly, demonstrating that a variance existed is not enough. Even if there were not admissible evidence to establish the single conspiracy, still Gonzalez must show prejudice. In his brief, Gonzalez argues that the prejudice he suffered from the purported variance was his being tried with Mordago: "The prejudice to [Gonzalez] was that even though he made a strong case for separating his trial from his co-defendants, the district court was naturally reluctant to grant the severance due to the fact that [Gonzalez] was charged with being part of a single conspiracy. Consequently, he was tried with Mordago. Mordago, in presenting his 'authorized informant' defense, implicated [Gonzalez] in the drug conspiracy." This claimed prejudice is the same as the claimed prejudice resulting from Gonzalez's initial challenge, i.e., that the district court committed plain error when it failed, sua sponte, to sever Gonzalez's trial from Mordago's once it became clear that

Mordago's antagonistic defense prevented him from receiving a fair trial.  We will turn, therefore, to that assertion.

### ii. Gonzalez's Claim of Prejudice

Gonzalez filed a pretrial motion to sever his case from the New York based co-defendants, contending that the government would be unable to prove a unified conspiracy and that he would be prejudiced by being tried with these co-defendants.  This motion was denied by the district court and Gonzalez does not challenge it on appeal.  Rather, Gonzalez now asserts, for the first time, that "unforeseen developments" at trial, i.e., Mordago's "authorized informant" defense, required that the district court grant, sua sponte, a mistrial and severance as to Gonzalez.  In support, Gonzalez cites our decision in United States v. Sandini, 888 F.2d 300, 309 (3d Cir. 1989), cert. denied, 494 U.S. 1089 (1990), for the proposition that "[t]he district court has to grant severance if it becomes obvious after the commencement of trial that joinder is no longer appropriate."

As an initial matter, we do not read Sandini as broadly as Gonzalez suggests we should.  We noted in Sandini that, in considering whether a district court committed plain error in failing to grant a mistrial and severance sua sponte based on developments at trial, "we acknowledge that an appropriate denial of a pretrial motion for severance does not preclude a later ruling that there should be a severance because of prejudice which develops at trial."  888 F.2d at 309 (citing Schaffer v.

United States, 362 U.S. 511, 516 (1960)).  Sandini does not,

however, announce a mandatory requirement for severance.  A

finding that severance might be appropriate based on developments

at trial does not compel the conclusion that a severance is

required whenever a trial fails to unfold as expected.  As we

proceeded to note in Sandini:

> [I]t is risky business for a judge on his own
> motion to declare a mistrial, as the
> defendant may thereafter contend that he was
> entitled to a completion of the first trial
> so that a retrial is barred by double
> jeopardy principles.  Thus, the defendant
> who, without asking for a mistrial gets one,
> will surely argue, and not unreasonably, that
> if he did not, as here, regard the alleged
> error as serious enough even to prompt his
> reaction, a court is effectively granting a
> mistrial over his objection without "manifest
> necessity" so that his retrial is barred.
> Furthermore, we point out that declaring a
> mistrial because of the conduct at trial of a
> codefendant, as opposed to that of the
> government, may well encourage collusive
> conduct by defendants at a joint trial so as
> to set the stage for mistrials and possible
> reversals.  The considerations we have set
> forth lead us to approach [defendant's]
> argument with considerable caution.

Id.

As to what was the "unforeseen development," Gonzalez

contends that he "did not anticipate . . . that Mordago would

implicate him in drug dealing, and discredit his defense that he

was a complete stranger to the drug conspiracy."

Our review of the record, however, clearly indicates

that Mordago's defense was anything but unforeseen.  More than a

month before the trial, all defense counsel involved in this case, including Gonzalez's, were alerted to Mordago's intention to assert an authorized informant defense. On July 20, 1992, each defense counsel was sent a copy of the government's response opposing Mordago's pretrial motion to disqualify the United States Attorney's Office from prosecuting him. Mordago's motion was based on the claim that he was acting as a government informant in connection with the charges contained in the indictment. Govt. App. at 608 ("Consolidated Response in Opposition to Defendant's Motions to Disqualify and Compel Discovery"). Even a cursory reading of the government's response reveals Mordago's intended defense. Early in its response, the government stated: "In his motion to disqualify, Mordago claims that he was acting as a government informant in connection with these charges." Several pages later, the government stated: "In his motion to disqualify, Mordago alleges that in light of the public authority defense that he intends to assert, AUSA Cohan may be called as [a] defense of prosecution witness." Thus, Gonzalez's counsel was on notice at least a full month before the trial commenced that Mordago planned to assert the government informant defense.

Notwithstanding this information, Gonzalez failed to amend his pretrial motion for severance.[16] In addition, not once

---

[16]. Gonzalez filed his pretrial motion for severance on May 19, 1992. This motion did not specifically allege any prejudice from being jointly tried with Mordago. Rather, the focus of the defendant's motion was his claim that evidence against the New

during the trial did Gonzalez's counsel object to what he now claims were prejudicial errors made by the district court relating to Mordago's defense. Rather, Gonzalez argues that the court, sua sponte, should have granted a severance once Mordago's defense became clear.

Because Gonzalez did not object to Mordago's defense or to the failure to sever, we review the district court's action for plain error. In reviewing for plain error, we are guided by the Supreme Court's recent decision in United States v. Olano, 113 S. Ct. 1770, 1776 (1993) which noted that:

> There must be an "error" that is "plain" and that "affect[s] substantial rights." Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the Court of Appeals, and the court should not exercise that discretion unless the error "'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"

(citations omitted).

In order for Gonzalez to demonstrate that the district court committed plain error, the defendant must first establish that he was entitled to a trial separate from Mordago. If Gonzalez fails to establish that he was entitled to a separate trial, then our analysis must stop, for the district court would

(..continued)
York based conspirators would "spillover" and unduly prejudice Gonzalez as it related to Count One of the indictment. The defendant's motion, never amended to include any potential prejudice from being joined with Mordago, was denied on August 26, 1992.

not have committed any error at all.  Before turning to the specific circumstances which form the basis of Gonzalez's claim, we must examine the substantive aspects of a failure to sever.

In Zafiro v. United States, 113 S. Ct. 933, 936 (1993), the Supreme Court considered whether Federal Rule of Criminal Procedure 14 "requires severance as a matter of law when co-defendants present 'mutually antagonistic defenses.'" 113 S. Ct. at 936.[17]  After expressing the federal system's strong preference for joint trials, the Court held that severance was not automatically required in such cases.  The Court stated:

> Mutually antagonistic defenses are not prejudicial per se.  Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion. . . .  We believe that, when defendants properly have been joined under Rule 8(b),[18] a district court

---

[17].  Fed. R. Crim. Pro. 14 provides in part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

[18].  Fed. R. Crim. Pro. 8(b) provides:

should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

Id. at 938 (citations omitted).

While the Court did not delineate all the circumstances in which a defendant could be prejudiced, it did note the types of situations in which prejudice might develop.

Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if the defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, the risk of prejudice is heightened. See Kotteakos v. United States, 328 U.S. 750, 774-775, 66 S. Ct. 1239, 1252-1253, 90 L.Ed. 1557 (1946). Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. See Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L.Ed.2d 476 (1968).

Id.
(..continued)

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

While Gonzalez's pretrial motion was based on a Kotteakos claim, he does not appeal the denial of that motion. Rather, he now asserts a Bruton related violation. His claim of prejudice is based on the proposition that Mordago's government informant defense resulted in the admission of certain evidence, allegedly incriminating to Gonzalez, without providing Gonzalez an opportunity to cross-examine Mordago.

Gonzalez points to several portions of Mordago's defense which, he alleges, specifically prejudiced his right to a fair trial. To review these, we will start with Mordago's release from prison on October 3, 1991. Mordago talked with law enforcement officials three times between the time of his release and his arrest on the current charges on November 8, 1991. During each conversation, Mordago was advised by the government that he was not to engage in any illegal activity until he was authorized to do so by his parole officer or another law enforcement official. Despite these warning, Mordago quickly became involved in drug activity.

In his discussions with law enforcement officials on October 10, November 5, and November 7, Mordago provided information concerning Paz and other drug traffickers. These discussions were recorded in FBI 302 reports, which were provided to Mordago's counsel prior to trial. The use of these reports by Mordago's counsel serves as the basis for Gonzalez's contentions. Gonzalez claims that these reports bolstered Mordago's authorized

informant defense while implicating Gonzalez in the conspiracy, thereby violating his right to a fair trial. However, our review of the record indicates that Gonzalez's claim lacks merit.

First, Gonzalez directs our attention to Mordago's counsel's cross-examination of Paz. There, counsel attempted to elicit from Paz whether Mordago ever informed Paz that Mordago had told government agents of Gonzalez's activity.[19] The government immediately objected, asserting that defense counsel was attempting to establish through his questions the fact that Mordago actually provided the information to the government which was the basis of counsel's questions. The court sustained the government's objection and reminded the jury that "the questions of lawyers do not themselves constitute evidence . . . . You should not assume anything from those questions because they are not embraced in a probative answer as to the occurrence of the

---

[19]. Cross-examination of Paz by Mordago's counsel:

> Q: And [Mordago] also did not tell you that he had provided information before the time of his arrest on a person by the name of Santiago Gonzalez, correct?
>
> A: No, he didn't tell me nothing.
>
> Q: He also didn't tell you slightly before or after the time of your arrest, that he provided information on drug dealing that referred to Miami?
>
> Government: Judge, I'll object to this line of questioning.

TT at 45 (Sept. 11, 1992; Afternoon Session).

events assumed therein." TT at 48 (Sept. 11, 1992; Afternoon Session). Given the court's immediate curative instruction, we find no prejudice to Gonzalez from this attempted cross-examination.

Gonzalez next asserts that the government bolstered Mordago's authorized informant defense to the detriment of Gonzalez's own defense when it offered the testimony of FBI agent Judith Tyler, who had talked with Mordago on October 10, 1991. Agent Tyler testified that Mordago told her that Paz was selling between twenty-eight and thirty kilograms of cocaine a week from a supplier in Miami. Gonzalez asserts that since the government, through Paz's testimony, established Gonzalez as Paz's Miami connection, the jury would have presumed that Mordago was referring to Gonzalez when he told agent Tyler that Paz had a Miami supplier. But agent Tyler did not testify that Mordago informed the government that Gonzalez was Paz's Miami connection. Moreover, there was other testimony concerning a Florida supplier, i.e., Oscar Fuentes. At best, the jury could only infer a connection. We do not find any undue prejudice to Gonzalez resulting from this testimony.[20]

Gonzalez next claims that he was prejudiced by statements that Mordago made to FBI agents, which statements were

[20]. Gonzalez offers the same exact argument as it relates to the testimony of AUSA Barbara Cohan concerning the October 10, 1991, conversation with Mordago. For the reasons stated in the main text, we do not find any undue prejudice to Gonzalez resulting from this testimony.

testified to by the agents, despite the fact that Gonzalez did not have the opportunity to cross-examine Mordago. Yet, the premise for Gonzalez's purported right to cross-examine is based on the assertion that Mordago inculpated Gonzalez when talking to law enforcement officials. A review of the evidence suggests otherwise.

Agent Tyler testified that Mordago told her that one of Paz's associates, Theodore Santiago (a/k/a "Poppo"), was selling between 100 and 150 kilograms of cocaine a week.[21] Agent Tyler mentioned this aspect of her conversation with Mordago several times during her testimony. Each time, she stated that Mordago's reference was to Theodore Santiago.[22]

---

[21]. Theodore Santiago was one of the twelve individuals named in the government's indictment, although he was not tried with these defendants.

[22]. Cross-examination of agent Tyler by Gonzalez-Rivera's counsel concerning the agent's meeting with Mordago on November 5, 1991:

> Q: Did [Mordago] not tell you that Mr. Paz had an associate living in Philadelphia?
>
> A: Yes, he did.
>
> Q: That individual was known as Santiago, right?
>
> A: Yes.
>
> Q: Also known as Poppo; right?
>
> A: Yes.
>
> Q: Did you know who Poppo was?
>
> A: No.

The government also presented the testimony of FBI agent Francis Thiel, who was with agent Tyler when she met with Mordago on November 5, 1991. Agent Thiel's testimony confirmed that Mordago's references to Santiago during this conversation were to Theodore Santiago, not Santiago Gonzalez.[23]

(..continued)

> Q: Do you know who Theodore Santiago is?
>
> A: No.
>
> Q: [Mordago] told you, did he not, that Poppo moved between 100 and 150 kilograms of cocaine a week, right?
>
> A: Yes.

TT at 24-25 (Sept. 15, 1992; Morning Session).

After this cross-examination, Agent Tyler was cross-examined by Mordago's counsel with regard to the November 5, 1991 meeting:

> Q: Do you recall Mr. Mordago saying there is a Colombian called Tosti T-O-S-T-I who lives on White Plains Road, the Bronx, New York, associated with the Cali Cartel?
>
> A: Yes.
>
> Q: Did he also mention an associate of Mr. Paz named Santiago also known as Poppo?
>
> A: Yes, he did.
>
> Q: Did he state that Poppo moves between one hundred to 150 kilos of cocaine per week?
>
> A: Yes, he did.

Id. at 47.

[23]. Direct examination of Agent Thiel by the government concerning Thiel's meeting with Mordago on November 5, 1991:

(..continued)

    Q: Now what other information did Joaquin
    Mordago provide on that date, November 5th,
    1991?

    A: He mentioned that there was another
    associate of Mr. Paz by the name of Mr.
    Poppo, who was a drug dealer in Philadelphia.

TT at 70 (Sept. 15, 1992; Morning Session).

    Cross-examination of agent Thiel by Gonzalez-Rivera's
counsel concerning the agent's meeting with Mordago on November
5, 1991:


    Q: [Mordago] also identified an individual
    named Santiago or Poppo who could obtain
    between 100 and 150 kilos of cocaine per
    week, correct?

    A: That is correct.

    Q: I heard you testify on direct examination
    you were part of this case, right?

    A: Yes.

    Q: You were monitoring the tapes, right?

    A: Yes.

    Q: Do you know an individual named Theodore
    Santiago?

    A: Yes, sir.

    Q: He is indicted in this case, right?

    A: Yes.

    Q: He has a nickname of Poppo, correct?

    A: That is correct.

Id. at 79-80.

Notwithstanding the specificity of agents Tyler's and Thiel's testimony, Gonzalez asserts that the jury was left with the impression that Mordago provided the government with information on him, rather than on Theodore Santiago. In support of this argument, Gonzalez asserts that a telephone number which Mordago associated with "Poppo" and provided to agents Tyler and Thiel was Gonzalez's girlfriend's telephone number.[24] In essence, Gonzalez is asserting that any reference in the agents' testimony to Theodore Santiago was in reality a reference to Santiago Gonzalez.

Gonzalez argues that the agents' testimony concerning Theodore Santiago, much of it solicited during cross-examination in support of Mordago's authorized informant defense, violated Gonzalez's right to a fair trial. Gonzalez asserts that not only was he unable to cross-examine Mordago as to these statements, but Mordago's defense was antagonistic to Gonzalez's defense, to the point of being irreconcilable and mutually exclusive. In his brief, Gonzalez asserts: "At the close of all the evidence, the jury faced a clear choice of either totally discrediting Mordago's claim that he had made pretrial incriminating statements against [Santiago Gonzalez], or rejecting out-of-hand

---

[24]. Both Tyler and Thiel testified that Mordago had given them a telephone number for Theodore Santiago. During his defense, Gonzalez presented Maria Soto, who testified that Gonzalez lived with her in Philadelphia. Soto testified that the telephone number, previously identified as Theodore Santiago's, was her number.

[Santiago Gonzalez's] defense that he was completely innocent of any involvement in Paz's drug dealing."

Gonzalez goes on to assert that this prejudice was compounded by Mordago's closing argument, in which Mordago's counsel, as part of his client's authorized informant defense, pinpointed Gonzalez as one of the traffickers that Mordago revealed to the government. Gonzalez's counsel did not object to this summation. Rather, he now asserts that counsel's "communication to the jury of Mordago's incriminating statements against [Gonzalez] was the same as the admission of a co-defendant's confession implicating another defendant in a joint trial when the codefendant does not take the stand."

As an initial matter, Bruton v. United States, 391 U.S. 123 (1968) does not apply when an attorney for a co-defendant implicates the defendant during closing argument. Sandini, 888 F.2d at 311. "We have . . . never held that Bruton applies when the attorney for a codefendant implicates a defendant during a closing argument and we perceive of no reason to do so because the arguments of counsel are simply not evidence. Bruton is directed toward preserving a defendant's right to cross-examination, and thus has nothing to do with arguments of counsel based on their interpretation of the evidence." Id. at 310-11.

Gonzalez attempts to distinguish Sandini based on the proposition that there was evidence to support counsel's assertions that Mordago had identified Gonzalez as Paz's Miami

drug supplier.  In essence, Gonzalez is asserting that the underlying evidence violated Bruton.  Thus, we examine the use of the FBI 302 reports to see if a Bruton violation occurred.

We reject Gonzalez's argument on two grounds.  First, the FBI 302 reports were never published to the jury.[25]  Second, Gonzalez reads too much into the testimony of agents Tyler and Thiel.  As previously discussed, both agents specifically testified that Mordago provided information on Theodore Santiago (a/k/a "Poppo"), not Gonzalez.  If the agents' testimony of what Mordago told them expressly inculpated Gonzalez, clearly there would be a Bruton problem and a stronger case for severance.  However, the evidence highlighted by Gonzalez provides little support for reversing his conviction.

In addition, we do not believe that Gonzalez was entitled to a mistrial and severance based on our reading of Zafiro.  Zafiro confirms that defendants have a heavy burden in gaining severance.  We find that Gonzalez has failed to meet this burden and that the defendant was not entitled to a severance.

Moreover, in regard to the government informant defense, Mordago's defense was not mutually exclusive of Gonzalez's defense that he was not aware of Paz's drug dealing

---

[25].  In fact, the district court was particularly careful in preventing a Bruton problem.  After summation, Mordago's counsel sought to have the FBI 302 reports published to the jury.  The court denied the motion, citing the potential prejudice to Gonzalez.  Thus, not only did the district court not commit plain error as its relates to Gonzalez's right to a fair trial, it sought to avoid any undue prejudice to the defendant.

activities. Gonzalez testified that he was not involved in Paz's drug trafficking and that he did not know, when he met with agent Tapia, why MRK owed Paz $97,500. The jury could have believed that Mordago was a government informant as his testimony related to Theodore Santiago and other traffickers, while also finding that Gonzalez was not involved in any drug activity. Thus, it would have been possible to acquit both Mordago and Gonzalez. Based on our review of the evidence at trial, we do not believe the defendants presented mutually exclusive defenses.

Moreover, the government presented a substantial amount of evidence in support of Gonzalez's role in trafficking cocaine. Gonzalez's conviction on Count Fourteen for distribution of a controlled substance was based on the September 13, 1991, sale of one kilogram of cocaine for $21,000 to agent Gonzalez, working undercover at MRK. This transaction was captured on videotape and the tape was admitted into evidence. Gonzalez's conviction on Count Sixteen for distribution of a controlled substance was based on the October 11, 1993, sale of five kilograms of cocaine to agent Gonzalez. Paz and agent Gonzalez agreed that agent Gonzalez would pay $19,500 per kilogram, for a total sale of $97,500. Our review of the evidence indicates that the government demonstrated Santiago Gonzalez's active involvement in this cocaine transaction.

In sum, we find that the district court did not commit error in deciding not to sever Gonzalez's trial from Mordago's.

We further find that there was substantial evidence, exclusive of the October tapes to support Gonzalez's conviction. We will, therefore, uphold Gonzalez's convictions on Counts One, Fourteen, and Sixteen.

### iii.   Fine and Restitution

In addition to his term of imprisonment and supervised release, the district court imposed a $5,000 fine on Gonzalez and ordered him to pay $21,000 in restitution. Gonzalez appeals both the fine and restitution, asserting that the district court erred in failing to make express findings as to his ability to pay. See United States v. Demes, 941 F.2d 220, 223 (3d Cir.), cert. denied, 112 S. Ct. 399 (1991). The government concedes that no such express findings were made. We will therefore remand the issue of the fine to the district court for it to make express findings regarding Gonzalez's ability to pay a fine.

With regard to the restitution ordered by the district court, the government contends that calling this sanction "restitution" was simply a clerical error which can be corrected without remand. The jury returned a special verdict that Gonzalez should forfeit $20,000 based on Count Twenty-Five. The government claims that the district court mistakenly ordered Gonzalez to pay $21,000 as restitution instead of directing the defendant to comply with the jury's special verdict on forfeiture. The government further asserts that under Fed. R. Crim. Pro. 36, a clerical error in a judgment may be corrected by

the district court at any time. We conclude, however, that the scope of the error is not that clear. We will, therefore, remand this issue to the district court to clarify whether or not it erred in denominating forfeiture as restitution and whether it misstated the amount of forfeiture if that is what was intended. If the district court intended to impose payment of restitution, it should also on remand make express findings as to such restitution.

### D. Melba Quintero

Melba Quintero was convicted of three telephone counts which the government concedes must be reversed (Counts Seventeen, Nineteen, and Twenty). We will do so. Quintero's remaining convictions are for conspiracy to distribute in excess of five kilograms of cocaine (Count One), distribution of cocaine (Count Twenty-Two), and possession with intent to distribute cocaine (Count Twenty-Three). Quintero asserts that the admission of the October tapes was prejudicial error as to these three convictions. The government maintains that the admission of the October tapes was harmless error based on the substantial evidence, excluding the October calls, against Quintero. This evidence includes testimony by Paz and FBI agent Joaquin Garcia ("Garcia"), a videotaped meeting and two telephone calls between Quintero and Garcia, and items seized from Quintero at the time of her arrest.[26]

---

[26]. These items included the address of Cruz, and the home, work and beeper numbers for Gonzalez-Rivera.

Paz testified that he received two and one-half kilograms of cocaine on consignment from Quintero and codefendant Elsa Cruz during a trip to New York shortly before his arrest. On October 31, 1991, Paz sold two of these kilograms to agent Gonzalez at MRK. This was the basis for Quintero's conviction on Count Twenty-Two for aiding and abetting the distribution of cocaine. Under the plan developed by the FBI for Paz's arrest, agent Gonzalez agreed to accept two of the kilograms of cocaine that Paz brought that day but to refuse the remainder. On leaving MRK, Paz was arrested with the remaining cocaine in his possession. This was the basis for Quintero's conviction on Count Twenty-Three for aiding and abetting Paz in the possession with intent to distribute cocaine. We find that there was adequate evidence, without the tapes, to support these convictions.

Turning to the conspiracy conviction, soon after Paz's arrest, the FBI undertook a further investigation of Quintero. An undercover operation was initiated in which Quintero was provided with agent Garcia's beeper number and told that a debt Garcia owed Paz would be paid to her instead. Approximately four weeks after Paz's arrest, Quintero contacted Garcia. Garcia testified that during their initial conversation he advised Quintero that he had some money that he owed Paz that he would give to her instead. After several more telephone conversations, Garcia and Quintero agreed to meet at a hotel in Queens, New

York, on December 10, 1991.  Garcia brought with him another undercover agent.  Quintero was accompanied by Elsa Cruz.

A videotape of the December 10 meeting was introduced into evidence.  At the start of the meeting Quintero introduced Cruz as "her partner."  Garcia asked Quintero and Cruz how much money Paz owed them.  They responded that they had provided Paz with more than two kilograms of cocaine.[27]  Garcia testified that

---

[27].  The following conversation was recorded on December 10, 1991.

> Agent Garcia ("AG"): And how much money does Cristobal owe you two?
>
> Elsa Cruz ("EC"): Two kilos and two thousand twenty-seven.
>
> AG: Two kilos and two thousand twenty-seven?
>
> Melba Quintero ("MQ"): No. . . . Two hundred twenty-seven.
>
> AG: How is that?
>
> EC: Yes.  It's two hundred.  Two hundred. . . It was two kilos and two hundred and twenty-seven.
>
> AG: Two hundred twenty-seven thousand dollars?
>
> EC: Nooo!
>
> MQ: No. . . Two kilos.
>
> EC: It was two kilos and two hundred and twenty-seven grams.
>
> AG: Ah . . . grams.

TT at 59-60 (Sept. 14, 1992; Morning Session).

he understood from this conversation that Paz owed them money for this amount of cocaine.[28]

In her defense, Quintero admitted that this conversation was about cocaine. She asserted, however, that this was a ploy that she and Elsa Cruz created in order to get back money which Quintero had given Paz for the purchase of a car. Quintero testified that any reference to cocaine during this meeting was an act in an effort to get Garcia to give them the money that he purportedly owed Paz. During this meeting, Garcia gave Quintero and Cruz $2,000 as a partial payment.[29]

Quintero seeks to discount the value of the videotape, asserting that it "cannot stand on [its] own once Paz' testimony is discounted." Our review of the transcript, however, convinces us that it can stand very well on its own without support from the October tapes. It was up to the jury to judge Quintero's credibility. We do not find it likely, in view of the other substantial evidence, that the jury's assessment of credibility was altered by the improper admission of the October tapes. Not only did Paz testify to receiving two and one-half

---

[28]. There were references throughout the forty minute meeting to cocaine and drug transactions. At one point, Quintero and Cruz asked Garcia if he could get a copy of the police report of Paz's arrest from Paz's girlfriend. Garcia testified that it is common for drug traffickers to show such records to their suppliers in an effort to be released from any debt owed on the cocaine seized.

[29]. This $2,000 was the basis for Quintero's conviction in Count Twenty-Eight for criminal forfeiture.

kilograms of cocaine from Quintero, the jury was presented with a videotaped conversation in which Quintero specifies to agent Garcia the amount of cocaine that she delivered to Paz. The jury had the opportunity to hear and evaluate Quintero's explanation for her statements on the videotape. They choose not to believe her.

We find that the admission of the October tapes constituted harmless error and that there is sufficient evidence to affirm Quintero's convictions on Counts One, Twenty-Two, and Twenty-Three.

### E. Joaquin Mordago

Joaquin Mordago was convicted of one telephone count which the government concedes must be reversed (Count Eighteen). Again, we will do so. Mordago's remaining conviction is for conspiracy to distribute in excess of five kilograms of cocaine (Count One). Mordago asserts a number of specific reasons why the admission of the October tapes constituted prejudicial error as to Count One. The government contends, on the other hand, that the admission of the October tapes was harmless error based on the other evidence against Mordago. This evidence included testimony by Paz, a videotape in which Paz was recorded talking with someone, purported to be Mordago, about the quality of certain cocaine, and items seized from Mordago at the time of his arrest.[30]

---

[30]. These items included the beeper numbers for Paz and Gonzalez-Rivera, and the telephone number of Gonzalez.

Mordago's role in the conspiracy involved his drying two and one half kilograms of "wet" cocaine which Paz received from Quintero and Cruz. Paz testified that Mordago helped him dry the cocaine by mixing it with acetone. According to Paz, Mordago had attempted to sell the three kilograms of cocaine but returned them to Paz when Paz believed that he had a willing buyer in agent Gonzalez at MRK. Paz stated that during the October 31 transaction at MRK, he called Mordago to complain about the quality of the cocaine. Paz's part of this conversation was recorded on the videotape, which was played for the jury.[31] There is no evidence, independent of Paz's

---

[31]. The following is testimony by Paz on direct examination by the government.

> Q: Now, during this part of the videotape, where are you seated?
>
> A: Behind a desk.
>
> Q: What were you doing?
>
> A: I was making a telephone call.
>
> Q: Who were you calling?
>
> A: Joaquin Mordago.
>
> Q: What were you saying to Joaquin Mordago?
>
> A: That I was having problems with that kilo, that what he had done was some shit.
>
> Q: Now looking at the top of page six of the transcript book, you stated towards the top of that page the following: There is one that you made for me there, that doesn't even have a shape. It doesn't even have shape.

testimony, of the identity of the person to whom he was talking during this conversation.

In addition to Counts One and Eighteen, Mordago was indicted on Count Sixteen for distribution of cocaine. The jury acquitted him on this count. Count Sixteen was based on the October 11, 1993, sale of five kilograms of cocaine to agent Gonzalez by Paz and Santiago Gonzalez. The government's evidence tying Mordago to the distribution of this cocaine was testimony by an FBI agent who on November 8, 1991, arrested Mordago in the Comfort Inn hotel room registered to Gonzalez, twenty minutes after Gonzalez was arrested in the parking lot.

(..continued)

> No, but we have to do that again. Now, what were you referring to in that part of the conversation that it didn't have shape?
>
> A: The kilo that [agent Gonzalez] did not want.
>
> Q: When you stated "but we have to do that again man," what had to be done again?
>
> A: That kilo that didn't have shape.
>
> Q: What was going to be done to give that kilo shape?
>
> A: Again, to take it, melt it, put it in a vase, I don't know what the man was going to do.
>
> Q: That man was going to do, who were you referring to?
>
> A: Joaquin Mordago.

TT at 42-43 (Sept. 3, 1992; Morning Session).

The defense asserted that Mordago was present in Gonzalez's hotel room as part of his efforts to provide information to the government. The government presented several law enforcement officials who testified that Mordago had not been authorized to act in such a manner. We can only hypothesize why the jury acquitted Mordago on Count Sixteen. Mordago asserts that the jury "apparently accepted" his authorized informant defense as it related to Count Sixteen. Equally plausible, however, is that the jury believed that the evidence against Mordago, arrested while waiting in Gonzalez's hotel room, was insufficient to find that he participated in the distribution of the five kilograms of cocaine to MRK. Given the fact the government presented no evidence that Mordago supplied, delivered, or sought direct payment for the five kilograms which were given to agent Gonzalez on consignment, it is quite possible that the jury did not believe the government had proved beyond a reasonable doubt Mordago's participation in the distribution.

The jury was presented with evidence of four taped phone conversations between Paz and Mordago during the month of October, one on October 12, two on October 17, and one on October 23. Agent Clouse testified that during the October 12 telephone conversation, Mordago offered to supply Paz with a device that Paz could use to detect wire taps and scramble telephone conversations to avoid being intercepted.

Paz testified about the contents of all four October telephone conversations. In each instance, the conversation was played for the jury, followed by Paz's testimony. During the October 12 telephone conversation, Mordago told Paz that "I'm in a pretty bad situation and I want to start doing something, do you understand it?" Paz testified that he interpreted this to mean that Mordago wanted to become involved in cocaine trafficking. Paz also testified, based on this conversation, that Mordago had an interest in meeting with Gonzalez-Rivera. During the October 23 telephone conversation, Mordago asked Paz "why don't you talk to Papo so that he get me" and later told Paz that "I want to start working brother." Paz testified that he understood Mordago to mean that he wanted Paz to find him some cocaine so that he could start selling it.[32]

Without these taped recordings, the only evidence presented by the government of Mordago's role in the conspiracy was Paz's testimony and the facts surrounding Mordago's arrest.

---

[32]. This conversation also contained a statement by Mordago that "Alfredo is going to bring to me . . . to fix the blender . . . you brought me yesterday." Paz testified this was a reference to the drying and mixing of the two and one-half kilograms of cocaine received from Quintero and Elsa Cruz. On cross-examination, however, Paz testified that the reference may have been to bullets for a gun that he claimed to have given Mordago. Paz's testimony on this aspect of the recorded conversation is ambiguous. Nevertheless, the government sought to prove that Mordago assisted Paz by drying the cocaine received from Quintero and Elsa Cruz. The government introduced into evidence a telephone conversation between Paz and Gonzalez recorded on October 28 in which Paz told Gonzalez that "Joaquin" had dried some cocaine for him. This conversation was also inadmissible.

Mordago asserts that Paz "had an overwhelming motive and bias against Mordago" based on the fact that Mordago had supplied information to the government on Paz's drug trafficking activity three weeks prior to Paz's arrest. On October 10, 1991, Mordago informed AUSA Cohan and agent Tyler during a telephone conversation that Paz was distributing between twenty-eight and thirty kilograms of cocaine per week.

AUSA Cohan and agent Tyler talked with Mordago by telephone on October 10, 1991, one week after his release from prison. AUSA Cohan testified that she recalled that Mordago told them that he had met Paz at a restaurant called El Kibuk and learned that Paz was distributing between twenty-eight and thirty kilograms of cocaine per week. Agent Tyler testified that during this October 10 telephone conversation, Mordago "advised me that he had met, had been to El Kibuk, and had learned that a guy named Cristobal Paz was selling 28 to 30 kilos of cocaine from a supplier in Miami." TT at 15 (Sept. 15, 1992; Morning Session).

Mordago's theory, if credible, gives Paz a motive to implicate Mordago in the conspiracy in retaliation for Mordago's role in providing the government with information concerning Paz's drug related activity. Moreover, the only substantive evidence establishing Mordago's role in the conspiracy outside of the October tapes is Paz's testimony. Unlike the other defendants recorded on the October tapes, for whom there was independent evidence beyond Paz's testimony to prove their active

role in the conspiracy, no such independent admissible evidence was introduced by the government with regard to Mordago.

The government responds that Mordago's arrest on November 8 in Gonzalez's Comfort Inn hotel room was evidence of his role in the conspiracy. However, Mordago's presence in the hotel room did not seem that culpable to the jury. They acquitted Mordago on Count Sixteen. The only other evidence brought to our attention of Mordago's involvement in the conspiracy was his possession of Gonzalez-Rivera's beeper number at the time of his arrest.

In a trial without the October tapes, Paz's testimony, with appropriate cross-examination, might be enough to support a finding that Mordago participated in the conspiracy. Here, however, the admission of the October tapes clearly disadvantaged Mordago to a greater degree that it did his co-defendants. Based on this analysis, we do not have a sure conviction that the admission of the October tapes did not prejudice him.

We do not reach this conclusion on the basis that Mordago should have been acquitted based on his authorized informant defense.[33] Rather, we only find that the admission of

---

[33]. In crediting the information Mordago supplied to the government on October 10, we in no way comment on the sufficiency of Mordago's authorized informant defense. That will be for a new jury to decide if the government seeks to retry the defendant. It is entirely possible that the jury believed, as the government argued, that Mordago was not authorized to engage in the illegal activity that the government sought to prove he engaged in. We only note the information that Mordago provided to the government on October 10 as it impacts on the credibility of Paz's testimony.

the October tapes constituted prejudicial error to defendant Mordago. We will therefore reverse Mordago's conviction on Count One.

## V. Jose Cruz

Cruz is not recorded on any telephone call offered into evidence by the government. Rather, he challenges the district court's refusal to suppress evidence of fifteen kilograms of cocaine found in his car during a search by the New Jersey State police. Cruz asserts that the search of a suitcase in the trunk of the car he was driving constituted an illegal search and seizure, which should have resulted in the evidence obtained being suppressed. A review of the facts culminating the search indicates that no constitutional violation occurred and the district court did not err in admitting the evidence obtained. We therefore will affirm Cruz's conviction on Counts One and Five.

## VI.

For the reasons stated above, we will affirm Gonzalez-Rivera's convictions on Counts One, Two, Five, Six, and Eight, Rodriguez's convictions on Count One and Thirteen, Gonzalez's convictions on Counts One, Fourteen and Sixteen, Quintero's convictions on Counts One, Twenty-Two, and Twenty-Three, and Cruz's conviction on Counts One and Five. We will reverse Gonzalez's convictions on Count Twenty-One, and Quintero's convictions on Counts Seventeen, Nineteen, and Twenty. We will

reverse Mordago's convictions on Counts One and Eighteen and remand Count One against Mordago to the district court for a new trial. We will reverse and remand for further proceedings the fine and restitution imposed on Gonzalez.

Defendants Gonzalez and Quintero will have to be resentenced because of the reversal of certain of their convictions. The government concedes that the suppression of the October tapes will also require that defendants Gonzalez-Rivera, Rodriguez, and Cruz be resentenced because in calculating their original sentences the district judge may have attached significance to one or more of the October tapes.[34] Therefore, we will remand for resentencing defendants Gonzalez, Quintero, Gonzalez-Rivera, Rodriguez and Cruz.

---

[34]. The government mades this concession in its letter of March 31, 1994:

> Re-sentencing for all six defendants would be necessary because within a given guideline range, the district court has wide discretion. Since the judge, in his discretion, could have attached considerable significance to one or more of the October tapes, re-sentencing would be appropriate to allow the judge to re-weigh all of the various factors which ultimately contribute to a particular sentence.